# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| RON SHAR RON WASHINGTON, | Case No. 3:18-cv-0078 |
| Plaintiff, | |
| | Judge Trauger |
| v. | Magistrate Judge Brown |
| NANCY A. BERRYHILL, Acting Commissioner, Social Security Administration, | |
| Defendant. | |

To:     The Honorable Aleta A. Trauger, District Judge

## REPORT AND RECOMMENDATION

Pending before the court is the plaintiff Ron Shar Ron Washington's Motion for Judgment on the Administrative Record (ECF No. 15), to which the defendant Social Security Administration (SSA) has responded (ECF No. 16). The plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of the final decision of the SSA. At issue is whether the administrative law judge (ALJ) erred in finding that the plaintiff was "not disabled," and therefore not entitled to Disability Insurance Benefits (DIB). (ECF No. 12 at 33-34).[1] This matter has been referred to the magistrate judge, pursuant to 28 U.S.C. § 636(b), for initial consideration and a Report and Recommendation.

Upon consideration of the parties' briefs, the transcript of the administrative record (ECF No. 12), and for the reasons offered below, the Magistrate Judge RECOMMENDS that the plaintiff's

---

[1] The Administrative Record is hereinafter referenced by "Tr." followed by a page number which can be found in large black print on the bottom right corner of each page.

Motion for Judgment on the Administrative Record be DENIED and the decision of the SSA be AFFIRMED.

## I.     Introduction

The plaintiff filed an application for disability insurance benefits under Title II of the Social Security Act (the Act) on October 20, 2016, alleging disability onset as of April 1, 2015,[2] due to post-traumatic stress disorder, memory problems, panic attacks, chronic sleep problems and migraine. (Tr. 423.)  His claim to benefits was denied at the initial and reconsideration stages of state agency review. (Tr. 157.) The plaintiff subsequently requested de novo review of his case by an Administrative Law Judge (ALJ). (*Id.*) The ALJ heard the case on May 10, 2017, when the plaintiff appeared with counsel and gave testimony.  (Tr. 75-80.)  Testimony was also received from a vocational expert.  (Tr. 80-82.)  At the conclusion of the hearing, the matter was taken under advisement until June 8, 2017, when the ALJ issued a written decision finding that the plaintiff was not disabled. (Tr. 157-67.) The plaintiff appealed, and the Appeals Council remanded the case because the ALJ gave great weight to two medical opinions which were not part of the administrative record. (Tr. 173-74.)

The plaintiff's case was assigned to a new ALJ who held a hearing on October 6, 2017 at which plaintiff appeared with a non-attorney representative and testified. (Tr. 46-61.) Testimony was also received from a vocational expert who was different from the vocational expert who testified at the first hearing. (Tr. 61-69.) At the conclusion of the hearing, the matter was taken under advisement until October 18, 2017, when the ALJ issued a written decision finding that the plaintiff was not disabled. (Tr. 21-34.) That decision contains the following enumerated findings:

[2] In his initial application for benefits, the plaintiff alleged a disability onset date of July 31, 2016. (Tr. 321.) That date was later changed to April 1, 2015 (Tr. 392), which is the disability onset date used by the ALJ and which the court uses here.

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2021.

2. The claimant has not engaged in substantial gainful activity ("SGA") since April 1, 2015, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: cervical degenerative joint disease, migraine headaches, residuals from right shoulder surgery, ulnar neuropathy, tinnitus, obstructive sleep apnea, posttraumatic stress disorder, alcohol use disorder and temporomandibular joint (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5. [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he can lift, carry, push and pull 20 pounds occasionally, and lift, carry, push and pull 10 pounds frequently. For any given eight-hour workday, he can sit six hours, and stand/walk six hours. He can frequently stoop, crouch, kneel, and never crawl. He can frequently balance with no limits on seeing or speaking. He can frequently climb stairs and ramps, but no climbing of ladder ropes or scaffolds. He can frequently reach bilaterally in all directions, including overhead with the right upper extremity and no limits with the left upper extremity. He can frequently perform fingering, feeling and handling bilaterally. He must avoid concentrated exposure to dusts, fumes, odors, gases, smoke, irritating inhalants and areas of poor ventilation. He must avoid concentrated exposure to vibrations. He can perform frequent use of hands and feet for the operation of controls, but must avoid concentrated exposure to extreme heat and cold. He can work at heights and near bodies of water when protected from falls, and must avoid working with or near dangerous and moving type of equipment or machinery. He must be required to repeat all job instructions and issues orally in order to ascertain that he heard said instructions, avoid concentrated exposure to bright lighting but can work in typical office type of overhead lights. He must avoid concentrated exposure to loud noises, but can work in an environment with noise levels equal to keyboarding, telephone rings, copier and printer noises as well as conversational level talk. He cannot work in any establishment dealing with or otherwise handling alcohol. As for mental limitations, he can perform simple routine, repetitive job tasks. He can understand, remember and carryout job instructions related to simple routine, repetitive job duties. He can accept occasional supervision, occasional interaction with co-workers and only casual interaction with the general public. He can have no direct work related interaction with the general public. He is restricted to working with objects and not with people. He can maintain attention, concentration and pace if allowed "traditionally" scheduled work breaks of 15 minutes in the first half of the

workday, 15 minutes break in the second half of the workday and a 30 minutes midday break. He can be punctual and work within a set schedule. He requires no special supervision to complete work assignments pertaining to simple routine repetitive job tasks, can make work related decisions regarding simple routine and repetitive job assignments. He can adapt to changes in job duties and work assignments if the changes are infrequent and gradually introduced.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565)

7. The claimant was born on December 8, 1973 and was 41 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from April 1, 2015, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 23-26, 32-33.)

On November 30, 2017, the Appeals Council denied the plaintiff's request for review of the ALJ's decision (Tr. 1–6), thereby rendering that decision the final decision of the SSA. This civil action was thereafter timely filed, and the court has jurisdiction. 42 U.S.C. § 405(g). If the ALJ's findings are supported by substantial evidence based on the record as a whole, then those findings are conclusive. *Id.*

### III. Review of the Record

The ALJ summarized the plaintiff's medical records as follows:

The claimant received treatment at the Veterans Affairs ("VA") Hospital from April 2014 through April 2017. On May 1, 2014, the claimant reported ringing in both ears constantly. He stated that his tinnitus was bothersome and could interfere with onset of sleep. He had difficulty with balance described as "lightheadedness" upon bending over. He was assessed with tinnitus and lightheadedness. (Exhibit 3F, p. 528). Medical resonance imaging ("MRI") of the claimant's lumbar spine taken on May 30, 2014 shows degenerative bone and disc disease with mild disc bulging. (Exhibit 13F, p. 7). In a note dated July 28, 2014, Thomas Dove, M.D. assessed the claimant with bilateral neck pain on exam, and sleep apnea. He reported that his neck pain was "long-standing." Dr. Dove stated, "Patients states he has sleep apnea." (Exhibit 3F, pp. 81-82). He complained of right shoulder pain, and was assessed with joint pain localized in the shoulder on July 29, 2014. (Exhibit 3F, p. 94).

The claimant was treated at Fort Campbell, Kentucky for a follow up of shortness of breath on July 16, 2014. He described his pain severity as 8/10 on the pain scale. On exam, respiration, rhythm and depth were normal. Exaggerated use of accessory muscles for inspiration was not observed. He was clear to auscultation. There was no wheezing, rhonchi, or rales crackles. However, his right shoulder was tender on palpation and pain was elicited on motion with abduction past 90 degrees. Otherwise, there was no swelling, erythema, warmth, or misalignment. Balance and gait stance were normal. His mood showed some outward signs of anxiety. He had no suicidal homicidal ideations. He was assessed with nontraumatic tendon rupture of the rotator cuff complete right: shortness of breath: and atypical chest pain. (Exhibit 11F, p. 10).

He followed up with Dr. Colby with numbness in the right upper extremity on March 27, 2015. Dr. Colby administered a nerve conduction study, which revealed evidence of tardy ulnar neuropathy of the right upper extremity. (Exhibit 9F, p. 6). Dr. Colby diagnosed the claimant with ulnar neuropathy, daily headache, and insomnia. (Exhibit 9F).

He presented in the orthopedic clinic for right shoulder pain on October 5, 2015. David Michael Doman, M.D. indicated the claimant had a large rotator cuff tear, which was repaired by Dr. Doman on November 11, 2014. Dr. Doman stated, "He is now 11 months after surgery and overall he is doing very well." The claimant stated that his pain overall was excellent, and that he was sleeping without difficulty. He was working on strengthening and felt he was making significant progress. Dr. Doman diagnosed the claimant with pain in right shoulder and complete rotator cuff tear or rupture of right shoulder , not specified as traumatic. (Exhibit 3F, p. 117).

On March 23, 2016, Benjamin Friday, M.D. Flight surgeon identified the claimant's assessment as follows: gastroesophageal reflux disease with

esophagitis, chronic maxillary sinusitis, atopic dermatitis, unspecified hip pain, migraine with aura, other polyosteoarthritis, and impingement syndrome of the right shoulder. (Exhibit 3F, p. 593).

He presented to the VA hospital to fill out disability papers and to have medications refilled on September 7, 2016. He needed Simethicon for GERD and Maxalt for migraines. Diagnoses included no depression and no generalized anxiety disorder. The following day, he was assessed with gastroesophageal reflux disease and migraine with aura. Courtney Humphrey, M.D. released the claimant without limitations. (Exhibit 4F, p. 11).

In a Rating Decision dated September 29, 2016, the Department of Veterans Affairs assigned the claimant an evaluation of 100 percent for PTSD effective August 1, 2016. Addition[al] ratings included: obstructive sleep apnea - 50 percent, migraine headaches - 30 percent, and degenerative changes of cervical spine - 10 percent. (Exhibit 7D).

The claimant presented to John Colby, M.D., neurologist with complaints of headaches on March 15, 2017. He told Dr. Colby that he had been having headaches for about 12 years. He believed that one of his big problems was PTSD. The claimant actively had depression and anxiety issues, and was seeing a psychiatrist at the VA at that time. Dr. Colby stated that EMG studies did not show any radiculopathy either in the lower or upper extremities. Dr. Colby reviewed a MRI report and concluded, "sounds like minor degenerative disc disease and degenerative joint disease. Nothing major." (Exhibit 9F, p. 3). The claimant was using a CPAP with a setting of 12. He was diagnosed with headache, cervicalgia, dorsalgia, insomnia, and lesion of ulnar nerve. (Exhibit 9F).

A CTA of the neck and head was performed simultaneously on March 20, 2017. The impression included normal enhancement of the carotid and vertebral arteries, and satisfactory enhancement of the intracranial arterial vasculature allowing for venous enhancement. (Exhibit 9F, p. 9).

He established as a new patient for primary care at the VA clinic on June 9, 2017. He said he felt extremely fatigued all the time and that he had 5-6 migraines weekly, which would last up to 5 hours. (Exhibit 17F, p. 3). His assessment included fatigue/vitamin D deficiency and migraines. *Id.* He followed up with Lindsay Diane Younger, Certified Family Nurse Practitioner on September 13, 2017. Ms. Younger added shortness of breath/chronic cough to the claimant's assessment. The claimant reported compliance with his CPAP machine and that it was working well for him. The assessment indicated the claimant was stable in clinic. As for migraines, the claimant reported that Maxalt worked better for him and he requested to have it ordered. Treating records state, "Conservative measures" for treatment of migraines. His physical examination was unremarkable. (Exhibit 19F, pp. 14-18).

Anita Johnson, M.D. reviewed the claimant's file and completed a physical functional capacity assessment on November 3, 2016. Specifically, Dr. Johnson indicated the claimant could occasionally lift and/or carry 20 pounds, and frequently lift and/or carry 10 pounds. For any given eight-hour workday, the claimant could stand and/or walk, and sit for about six hours, respectively. As for postural limitations, the claimant could frequently climb ramps stairs, balance, stoop, kneel, crouch, or crawl but could not climb ladders, ropes, or scaffolds. Dr. Johnson indicated the claimant would have to avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, and hazards. (Exhibit IA, pp. 7-9). The findings by Michael Ryan, M.D. in a residual functional capacity assessment dated December 26, 2016 were identical to Dr. Johnson's opinion, except that Dr. Ryan determined the claimant could tolerate unlimited exposure to fumes, odors, dusts, gases and poor ventilation. (Exhibit 4A, pp. 10-12).

The claimant was seen by Kenneth J. Victor, Psy.D. clinical psychologist on July 20, 2015. He reported that he felt sad, blue, and "depressed." As for anxiety, he reported, "I worry a lot." On the other hand, he denied any panic attacks. He believed that his depressive and anxiety issues started about 12 years ago, and he began to recognize 10 years ago, but did nothing about it.

Social history notes show a good relationship with his wife of 22 years with an increase in arguments over the previous year associated with increased alcohol use. His children ranged in ages from 27 to 10 and he had a good relationship with all until "episodes" kick in usually surrounding his increase in alcohol use. (Exhibit 3F, p. 345). Dr. Victor diagnosed the claimant with alcohol use disorder and observation for suspected condition (R/O depressive and anxiety disorder and R/O PTSD). (Exhibit 3F, p. 346). Dr. Victor treated the claimant on November 18, 2015. He replied that his headaches continued. In the assessment, Dr. Victor indicated the claimant's functional status as fair and generally stable. Dr. Victor stated, "continue assessment to include PTSD and memory functioning." (Exhibit 12F, p. 3).

He followed up with Dr. Victor on May 1, 2016 for psychiatric treatment. In a treatment session note on this date, Dr. Victor indicated the claimant's thought process was logical and goal directed. Thought content was appropriate and without delusions or paranoia, and no report or observance of hallucinations. He was assessed with major depressive disorder and PTSD. (Exhibit 3F, p. 556).

He presented to E-Ling Cheah, Psy.D. for a psychological evaluation on January 31, 2017. He stated that he drinks 'everyday . . , enough though my wife tell me that it's too much . . , sometimes I can drink 4 to 5 shots of anything and a couple of beers . . . for years.' (Exhibit 6F, p. 2). He reported that he had never had any periods of inpatient hospitalization for mental health problems.

As for activities of daily living, he managed his finances with some difficulty ('my wife assists me.'). He said he did not perform any house or yard work. He attended church occasionally. He stated he had some problems with his short-term memory and concentration abilities. For example, he sometimes would forget his birthday, kids' names, wife's birthday, and the number of children he has. However, he denied any history of neurological incident. Dr. Cheah noted the claimant appears to be exaggerating his symptoms and did not appear to be putting forth his best true effort throughout the evaluation. In summary, he showed evidence of a mild to moderate impairment in social relating. Dr. Cheah diagnosed the claimant with malingering, alcohol use disorder, and posttraumatic stress disorder. (Exhibit 6F, p. 8).

In a Psychosocial Assessment dated May 9, 2017, Tina Lynn Tomlinson, Licensed Clinical Social Worker diagnosed the claimant with post-traumatic stress disorder and major depressive disorder. The claimant reported that he could not sleep at all. Whenever he does fall asleep, the claimant's wife said he would be fighting. The claimant stated, 'I wake up with my heart racing and sweaty palms,' but his wife was able to calm him down. (Exhibit 16F). Treating records indicate the claimant presented to Ms. Tomlinson for his second individual session on June 15, 2017. He reported feeling as if medications were not effective. He reported irritability, panic attacks with little to no trigger, sleeping 'maybe two hours a day,' and racing thoughts. (Exhibit 17F, p. 6). The claimant requested a letter stating that he was receiving mental health and primary care from the VA. *Id.*

In a letter dated June 15, 2017, Ms. Tomlinson confirmed the claimant's mental health treatment at the clinic and his symptoms associated with PTSD and major depressive disorder. Ms. Tomlinson noted the claimant had been receiving treatment since March 22, 2017 on a monthly basis. Ms. Tomlinson offer[ed] no opinion as to any mental related restrictions or abilities in this one page letter. (Exhibit 18F).

Four days post hearing the claimant's representative submitted a medical statement completed by Ms. Tomlinson. The representative did not offer any justification for the late submission of the statement and there is no reasonable justification for her violation of the five day rule. In fact, the representative gave no notice whatsoever (at the hearing or post hearing) regarding the submission of any additional evidence. The claimant's representative at the close of the hearing indicate the record was complete. The undersigned has included the late submitted medical records as evidence in the case and admits the same as Exhibit 21F.

I give no weight to the opinion of Ms. Tomlinson for many different reasons (Exhibit 21F). Consider that all of the marked limitations and the extreme limitation are predicated merely upon subjective information provided exclusively by the claimant. Second, Ms. Tomlinson has administrated no

objective and recognized tests to ascertain if the subjective complaints made by the claimant are valid (recall that after the battery of tests administrated by Dr. Cheah he concluded the claimant was malingering). Third, the areas noted by Ms. Tomlinson as marked limitation or extreme limitations are in total conflict with the few areas noted by her to be moderate. Consider, if the claimant has only a moderate limitation in the ability to make simple work related decision then it is logical to conclude that in order to make such decision he would have to be capable of understanding and remembering the simple work instruction. However, it is the opinion of Ms. Tomlinson that the claimant is unable to recall or understand simply work instruction but on the other hand, he is capable of mak[ing] decision[s] on such work instructions. Another example, Ms. Tomlinson indicates that the claimant is only moderately impaired in activities of daily living which would indicate the claimant has at least some basis social skills; however, Ms. Tomlinson alleges that the claimant has no social skills whatsoever. At the hearing, the claimant testified that he is capable of reading and writing English as well as adding and subtracting. Furthermore, he indicated his ability to manage his money. Ms. Tomlinson, at Exhibit 21F, assessed 16 areas as marked limitations and one area as an extreme limitation, to include drastic limits in the ability to maintain attention and concentration and if the claimant is as limited as asserted by Ms. Tomlinson he certainly would be precluded from managing money, reading and writing, especially with marked limits in attention and concentration.

Theren Womack, Ph.D. completed a Psychiatric Review Technique Form ("PRTF") and functional capacity assessment on November 1, 2016. (Exhibit IA, pp. 4-6 and 9-11). Dr. Womack indicated the claimant had a 'moderate' degree of limitation with restriction of activities of daily living, difficulties in maintaining social functioning, and in concentration, persistence, or pace. (Exhibit 1A, pp. 4-6). In a functional capacity assessment, Dr. Womack concluded that the claimant could understand and remember simple and low-level detailed tasks, but no executive-type tasks. He could consistently sustain concentration, persistence and pace for the above tasks within the above restrictions for periods of at least two hours at a time, throughout the day, to complete a normal workday/workweek, despite occasional interruptions from psychologically based symptoms. He could consistently sustain interactions with the public, and could sustain occasional, brief non-confrontational interactions with coworkers and supervisors. He would work better with things than with people. He could adapt to infrequent, gradual workplace changes. (Exhibit 1A, pp. 9-11).

The findings in a PRTF and functional capacity assessment by M. Duncan Currey, Ph.D. on February 2, 2017 were similar to Dr. Womack's opinion. (Exhibit 4A, pp. 7-8 and 12-14). Dr. Currey determined the claimant had moderate restrictions in understanding, remembering or applying information, interaction with others, concentration and in adaptation and managing oneself. (Exhibit 4A, pp. 7-8). In the functional capacity assessment, he could

understand and remember simple and low level detailed instructions, but could not make independent decisions at an executive level. He had the ability to maintain attention and concentration for simple and low level detailed tasks with customary breaks with infrequent interruptions from psychologically based symptoms. He could not effectively interact with the general public and could have infrequent/superficial interactions with coworkers and supervisors. He could adapt to infrequent change. (Exhibit 4A, pp. 12-14).

Cheryl Washington, the claimant's wife, wrote a letter on behalf of the claimant on December 2, 2016. Mrs. Washington stated she had to be with the claimant at all times in public because of his inability to cooperate. She stated that the claimant lacked the social ability to communicate with others and family members. He had panic attacks 4-5 times per week, and she had to be with him to calm him down. She said she had to attend all medical appointments because of the claimant's inability to remember information/instructions from the doctors. (Exhibit 1l E).

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause a limited number of the alleged symptoms; furthermore, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

As for the claimant's statements about the intensity, persistence, and limiting effects of his or her symptoms, they are inconsistent because the objective medical findings are not disabling. For example, in October 2015, Dr. Doman stated the claimant was 11-months status post shoulder surgery, and that he was doing very well overall. Even the claimant reported that his pain overall was excellent, and that he slept without difficulty. (Exhibit 3F, p. 117). As recent as March 2017, Dr. Colby reviewed a MRI report and concluded that the claimant's cervical spine -sounds like minor degenerative disc disease and degenerative joint disease . . . Nothing major.- Nothing major.- (Exhibit 9F, p. 3). His ulnar neuropathy, migraines and tinnitus do not appear to cause any functional limitations according to the medical treatment records. The TMJ (jaw) issue was not mentioned by the claimant until the undersigned inquired about this condition and the offered testimony appeared to be a mere afterthought. On May 1, 2016, Dr. Victor noted the claimant's psychiatric profile. Dr. Victor stated that the claimant's thought process was logical and goal directed. Thought content was appropriate. He had no delusions or paranoia. He had no report or observance of hallucinations. (Exhibit 3F, p. 556). In essence, the claimant was psychologically unremarkable. On January 31, 2017, Dr. Cheah, the psychological consultative examiner noted that the claimant appears to be exaggerating his symptoms and did not appear to be putting forth his best true effort throughout the evaluation. (Exhibit 6F, p. 8). Dr. Cheah diagnosed the claimant with malingering. Dr. Cheah reached his

conclusions after administrating acceptable objective psychological testing. All of these factors are consistent with the residual functional capacity above.

As for the opinion evidence, the undersigned gives significant weight to Dr. Cheah at Exhibit 6F. Dr. Cheah's opinion is based upon recognized objective, psychological testing and is more reliable than the VA records, which reference only subjective complaints made by the claimant. The undersigned gives some weight to the mental assessments by Dr. Womack and Dr. Currey because they found moderate limits in the claimant's mental domains of functioning and these conclusions are supported in part by the full weight of the objective evidence. (Exhibits 1A and 4A).

The Hopkinsville VA Clinic, one page statement by Ms. Tomlinson on June 15, 2017 merely said claimant is being treated, and does not offer any opinion on the claimant's ability to engage in any activity. (Exhibit 18F).

The undersigned finds that the service connected disability rating is not applicable to the issues under the SSA. The VA rating has no reference to the residual functional capacity related to work, and is strictly based upon diagnosis and VA regulations requiring a percentage of disability based merely upon a particular diagnosis-such as tinnitus rated at 10 percent and 30 percent for TMJ-neither of which would prevent work activity at the SGA level.

The undersigned gives partial weight to the assessments by the State agency medical doctors (Dr. Johnson and Dr. Ryan) because they failed to consider the claimant's shoulder impairment and functional limits associated with pushing, pulling and reaching overhead. (Exhibits 1A and 4A).

## IV. Conclusions of Law

### A. Standard of Review

This court reviews the final decision of the SSA to determine whether substantial evidence supports that agency's findings and whether it applied the correct legal standards. *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 833 (6th Cir. 2016). Substantial evidence means "'more than a mere scintilla' but less than a preponderance; substantial evidence is such 'relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)). In determining whether substantial evidence supports the agency's findings, a court must examine the record as a whole, "tak[ing] into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636,

641 (6th Cir. 2013) (quoting *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984)). The agency's decision must stand if substantial evidence supports it, even if the record contains evidence supporting the opposite conclusion. *See Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 473 (6th Cir. 2016) (citing *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Accordingly, this court may not "try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012) (quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). Where, however, an ALJ fails to follow agency rules and regulations, the decision lacks the support of substantial evidence, "even where the conclusion of the ALJ may be justified based upon the record." *Miller*, 811 F.3d at 833 (quoting *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014)).

### B. The Five-Step Inquiry

The claimant bears the ultimate burden of establishing an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 423(d)(3). The SSA considers a claimant's case under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.

2) A claimant who does not have a severe impairment will not be found to be disabled.

3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.

4) A claimant who can perform work that he has done in the past will not be found to be disabled.

5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

*Parks v. Soc. Sec. Admin.*, 413 F. App'x 856, 862 (6th Cir. 2011) (citing *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007)); 20 C.F.R. §§ 404.1520, 416.920. If the ALJ determines at step four that the claimant can perform past relevant work, the claimant is deemed "not disabled" and the ALJ need not complete the remaining steps of the sequential analysis. *Id*. § 404.1520(a). "Past relevant work" is defined as work that claimants have done within the past fifteen years that is "substantial gainful activity" and that lasted long enough for the claimant to learn to do it. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006) (citing 20 C.F.R. § 404.1560(b)(1)).

The claimant bears the burden through step four of proving the existence and severity of the limitations her impairments cause and the fact that she cannot perform past relevant work; however, at step five, "the burden shifts to the Commissioner to 'identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity . . . .'" *Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 628 (6th Cir. 2016) (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). The SSA can carry its burden at the fifth step of the evaluation process by relying on the Medical-Vocational Guidelines, otherwise known as "the grids," but only if a nonexertional impairment does not significantly limit the claimant, and then only when the claimant's characteristics precisely match the characteristics of the applicable grid rule. *See Anderson v. Comm'r of Soc. Sec.*, 406 F. App'x 32, 35 (6th Cir. 2010); *Wright v.*

*Massanari*, 321 F.3d 611, 615–16 (6th Cir. 2003). Otherwise, the grids only function as a guide to the disability determination. *Wright*, 321 F.3d at 615–16; *see also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990). Where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, typically through vocational expert testimony. *Anderson*, 406 F. App'x at 35; *see Wright*, 321 F.3d at 616 (quoting SSR 83-12, 1983 WL 31253, *4 (Jan. 1, 1983)).

When determining a claimant's residual functional capacity (RFC) at steps four and five, the SSA must consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. §§ 423(d)(2)(B), (5)(B); *Glenn v. Comm'r of Soc. Sec.*, 763 F.3d 494, 499 (6th Cir. 2014) (citing 20 C.F.R. § 404.1545(e)).

### C. The Plaintiff's Statement of Errors

As an initial matter, the plaintiff does not raise any claims of error regarding the ALJ's physical RFC or consideration of the evidence regarding his physical impairments. Rather, the plaintiff's arguments relate solely to the ALJ's mental RFC and consideration of the evidence related to the plaintiff's mental health. As such, only the mental health evidence in the record is discussed.

The plaintiff argues that the ALJ erred "by failing to adequately and appropriately weigh the medical opinion evidence of record which demonstrates greater limitation than those accounted for in the ALJ's mental RFC finding." (ECF No. 15.) Specifically, the plaintiff contends that the ALJ did not properly consider the opinion evidence of James Dodson, Psy.D., E-Ling Cheah, Psy.D., and Tina Tomlinson, LCSW, nor did the ALJ properly consider the evidence of record from the Veteran's Administration. (*Id.*)

The SSA regulations identify three types of medical opinions and explain how each must be evaluated. *See* 20 C.F.R. §§ 404.1527; 404.1502.[3] A non-examining source is a physician, psychologist, or other acceptable medical source[4] who has not examined the claimant but provides an opinion in the claimant's case. 20 C.F.R. § 404.1527. An examining but non-treating source is an acceptable medical source who has examined but does not, or did not, have an ongoing treatment relationship with the claimant. *Id.* A treating source is an acceptable medical source who has examined the claimant and has, or had, an ongoing treatment relationship that was consistent with accepted medical practice. *Id.* An ALJ must give controlling weight to the opinion of a treating source if: (1) the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) the opinion "is not inconsistent with the other substantial evidence in the case record." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375-76 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527).

Deference to the opinion of a treating physician is appropriate, however, only where the particular opinion "is based upon sufficient medical data." *Miller v. Sec'y of Health and Human Srvcs.*, 1991 WL 229979 at *2 (6th Cir. Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Srvcs.*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)). The ALJ may reject the opinion of a treating physician where it is unsupported by the medical record, merely states a conclusion, or is contradicted by substantial medical evidence. *See Cohen v. Sec'y of Health and Human Srvcs.*,

---

[3] On January 16, 2017, the SSA published final rules entitled, "Revisions to Rules Regarding the Evaluation of Medical Evidence." 82 Fed. Reg. 5844; 82 Fed. Reg. 15132. These final rules are effective as of March 2017, but, some of the new final rules apply only to claims filed after March 27, 2017 and some to claims filed before that date. Because the plaintiff's claim for disability benefits was filed before March 27, 2017, the rules applicable to such claims are relied on here.

[4] Acceptable medical sources are a licensed physician, a licensed psychologist, a licensed optometrist, a licensed podiatrist, a qualified speech-language pathologist, a licensed audiologist, a licensed advance practice nurse, and a licensed physician assistant. 20 C.F.R. § 404.1502.

964 F.2d 524, 528 (6th Cir. 1992); *Miller v. Sec'y of Health and Human Srvcs.*, 1991 WL 229979 at *2 (6th Cir. Nov. 7, 1991) (citing *Shavers*, 839 F.2d at 235 n.1); *Cutlip v. Sec'y of Health and Human Srvc.*, 25 F.3d 284, 286-87 (6th Cir. 1994).

If an ALJ accords less than controlling weight to a treating source's opinion, the ALJ must "give good reasons" for doing so. *Gayheart*, 710 F.3d at 376. Such reasons must be "supported by the evidence in the case record and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* This requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). Simply stating that the physician's opinions "are not well-supported by any objective findings and are inconsistent with other credible evidence" is, without more, too "ambiguous" to permit meaningful review of the ALJ's assessment. *Gayheart*, 710 F.3d at 376-77.

Moreover, even if the ALJ gives less than controlling weight to a treating physician's opinion, the ALJ must still determine the weight to give it. *Id.* at 376. In doing so, the ALJ must consider the following factors: (1) length of the treatment relationship and frequency of the examination, (2) nature and extent of the treatment relationship, (3) supportability of the opinion, (4) consistency of the opinion with the record as a whole, (5) the specialization of the treating source, and (6) other relevant factors. *Id.* (citing 20 C.F.R. § 404.1527). While the ALJ is not required to explicitly discuss each of these factors, the record must nevertheless reflect that the ALJ considered them. *See*, *e.g.*, *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *Undheim v. Barnhart*, 214 Fed. Appx. 448, 450 (5th Cir. Jan. 19, 2007).

Opinions from non-treating and non-examining sources are never assessed for "controlling weight." *Crawford v. Comm'r of Soc. Sec.*, No. 1:17-CV-723, 2018 WL 6625124, at *4 (S.D. Ohio Dec. 18, 2018). A non-treating source's opinion is weighed based on the medical specialty of the source, how well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(3)-(6); *Wilson*, 378 F.3d at 544. Because a non-examining source has no examining or treating relationship with the claimant, the weight to be afforded the opinion of a non-examining source depends on the degree to which the source provides supporting explanations for his or her opinions and the degree to which his or her opinion considers all of the pertinent evidence in the record, including the opinions of treating and other examining sources. 20 C.F.R. § 404.1527(c)(3).

In addition to acceptable medical sources, the claimant may also present evidence from "other medical sources." *Simmons v. Berryhill*, No. 4:17-CV-15-TWP-CHS, 2018 WL 1413179, at *9 (E.D. Tenn. Mar. 21, 2018). An ALJ is not held to the same standards when evaluating this type of opinion as compared to the evaluation of an opinion provided by an acceptable medical source. *Id.* "[O]ther-source opinions are not entitled to any special deference." *Hill v. Comm'r of Soc. Sec.*, 560 F. App'x. 547, 550 (6th Cir. 2014). An ALJ has broad discretion when evaluating the opinion of an "other" source. *See Brown v. Comm'r of Soc. Sec.*, 591 F. App'x. 449, 451 (6th Cir. 2015); *Engebrecht v. Comm'r of Soc. Sec.*, 572 F. App'x 392, 398 (6th Cir. 2014) (quoting *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007) (recognizing that the court has "previously held that an ALJ has discretion to determine the proper weight to accord opinions from 'other sources'[.]")

### 1. James Dodson, Psy.D.

The plaintiff complains that the ALJ failed to appropriately weigh the opinion of James Dodson Psy.D., who the plaintiff repeatedly identified as a treating source and who authored a PTSD VA Disability Benefits Questionnaire. (Doc. No. 15, PageID# 1918-19.)

There is no question that the plaintiff repeatedly *identified* Dodson as a treating source, (Tr. 137, 152. 574, 582, 596), what the record lacks, however, is any evidence to support plaintiff's claim that Dodson is a treating source. Under SSA regulations, a treating physician must see (or must have seen) a claimant with a frequency consistent with accepted medical practice. 20 C.F.R. § 404.1527. There is no evidence in the record to demonstrate that Dodson was treating or had ever treated the plaintiff. Rather, the evidence reflects only that Dodson saw the plaintiff to complete the VA form; an act, specifically identified in the regulations, that is insufficient to establish that Dodson is a treating source. *Staymate v. Comm'r of Soc. Sec.*, 681 F. App'x 462, 467 (6th Cir. 2017) (noting that "[t]he regulations make clear that a relationship based "solely on [a claimant's] need to obtain a report in support of [a] claim for disability" does not constitute a "treating source." (quoting 20 C.F.R. § 416.902)).[5]

Reviewing the VA form itself belies plaintiff's claim that Dodson was a treating source. First, the form advises "that this questionnaire is for disability evaluation, not treating purposes." (Tr. 1670.) Second, despite the forms admonitions that "to provide an accurate medical opinion, the Veteran's claims folder must be reviewed," and that "pertinent information from collateral sources" should be identified (Tr. 1672), at least some of which a treating source would have

---

[5] On October 5, 2017, the plaintiff received a letter from the Clarksville Behavioral Health clinic explaining that Dodson was not a VA affiliated provider but that he was contracted through a third-party service, evidence which supports the ALJ's conclusion that Dodson was not a treating physician.

available, Dodson did not review the plaintiff's VA file, nor did he identify any collateral sources that he reviewed. (*Id.*) What is more, Dodson expressly noted that "[n]o psychological test data [was] available showing occupational/social impairment, apart from applicant's report." (Tr. 1671.) Thus, Dodson relied exclusively on the subjective complaints that the plaintiff related to him during a single meeting. (Tr. 1676.) [6] Finally, in the section of the form seeking relevant mental health history, only Dr. Victor is identified. (Tr. 1672.) It takes no leap in logic to believe that if he were treating the plaintiff, Dodson would have identified himself as well.

Finally, contrary to the plaintiff's argument, the ALJ did not suggest that there was no indication of who completed the form, but rather, that there was no indication of who added the handwritten margin notes that notated sections of the form which the writer believes establish that the plaintiff is disabled under Listing 12.02. (Tr. 1670-76.) Had Dodson been a treating source and had he opined, consistent with the hand-written notes, that the plaintiff met Listing 12.02, the ALJ might have been obligated to give such an opinion controlling weight, or at least, to explain why such weight was not given. However, as noted, there is no evidence to support the plaintiff's contention that Dodson was a treating source, and there is no evidence to support the plaintiff's suggestion that Dodson wrote the hand-written notes opining that he met Listing 12.02. Indeed, all of the evidence is to the contrary.

---

[6] Based on his own behavioral observations, Dr. Dodson reported that the plaintiff "arrived on time and unaccompanied for assessment;" that his "[a]ppearance was well-groomed and neat;" that he was "[o]riented to person, place, time and situation;" that rapport with the plaintiff was easily "established and maintained;" that the plaintiff's speech was "well-articulated and free from slurring and stuttering;" that the plaintiff's "[t]hought process appeared cogent" and the "thoughts expressed reflected relevance to topics at hand;" and that the plaintiff had "[g]ood judgment and fair insight." (Tr. 1676.) Although he did also note that the plaintiff's "anxious, confused, [and] irritable affect appeared congruent with [his] underlying mood." (*Id.*)

The VA form was accompanied by three introductory pages: one page which identifies the form as a supporting document from the VA, and states, "[p]lease note pages that correspond to 12.02 requirement in [the] margin that is support[ed] by the VA exam" (Tr. 1667); and a two-page photocopy of the criteria for listing 12.02 with margin notes referring the reader to the pages of the VA form that purportedly establish each criteria (Tr. 1668). Given that Dodson completed the form to assist the plaintiff with his application for disability benefits from the VA and that the form explains that the information provided will be considered as part of the VA's evaluation of the plaintiff's disability claim, but the introductory pages and all hand-written notes on the form relate to the SSA criteria for Listing 12.02, information irrelevant to the VA and its processing of the plaintiff's claim for VA disability benefits, it strains credulity to suggest that Dodson added the handwritten notes.

Therefore, the ALJ did not err in not giving Dodson's opinion "any significant weight," because there is no evidence to show that Dodson was a treating physician or that he opined as to the plaintiff's satisfaction of any SSA Listing criteria and Dodson's determination that the plaintiff met the VA disability criteria was not binding on the ALJ. 20 C.F.R. § 404.1504 (explaining that "[a] decision by any other governmental agency . . . about whether you are disabled . . . is based on its rules, it is no binding on us and is not our decision about whether you are disabled.")

Substantial evidence supported the ALJ's finding that Dodson's opinion was "not entitled to any significant weight." (Tr. 24.) The ALJ did not err in his evaluation of Dodson's opinion.

### 2. E-Ling Cheah, Psy.D.

As to his second claim of error, the plaintiff argues that the ALJ improperly gave Cheah's assessment significant weight because "Dr Cheah *did not provide an assessment of limitations*

explicitly stating that that could not be done given the testing results." (Doc. No. 15, PageID# 1919 (emphasis in original).)

The plaintiff appeared for a consultative psychological evaluation with Cheah on January 31, 2017 at which time Cheah administered a clinical interview, mental status exam, Wechsler Adult Intelligence Scale – fourth edition (WAIS-IV), Wide Range Achievement Test – fourth edition (WRAT4) and conducted a records review, although he did not specify where the records came from or what time period they covered. (Tr. 1682-89.) On scoring the WAIS-IV, the plaintiff tested "within the extremely low range of intellectual functioning . . . and his overall thinking and reasoning abilities exceed[ed] those of only approximately 0.1% of individuals his age." (Tr. 1685.) Cheah noted that based on the plaintiff's WAIS-IV score, his "ability to reason with words [was] comparable to his ability to reason without the use of words." (*Id.*) With respect to the WRAT4, which assesses "core academic abilities in basic reading, spelling, comprehending sentences, and math computation," the plaintiff scored in the first stanine,[7] the lowest stanine, on all tests except the math computation test in which he scored in the second stanine. (Tr. 1687.) Cheah noted that the plaintiff "has a highly inconsistent ability to recall and understand instruction posed and simple words used. (Tr. 1688.) Cheah also noted that:

> [the plaintiff] appeared to work at an appropriate pace on most tasks, but on a slow pace on timed tasks. He required continued encouragement to attempt and persist on tasks ("I can't do that . . . I'm not good at that"). He displayed behavior that appeared to indicate that he was easily distracted (i.e., stopped what he was doing, stretched, looked around the room, looked out the window, asked after noises heard outside the office), however, it did not appear that this behavior indicated a genuine lack of attention or concentration as these occurred primarily on timed tasks and he was able to continue with minor redirection. Emotional factors did not appear to have significantly hindered his

---

[7] A stanine is a way to scale scores on a nine-point scale, with nine being the highest and one being the lowest score, that can be used to convent any test score into a single digit score. *See* Statistics How to at https://www.statisticshowto.datasciencecentral.com/stanine/ (last visited Jan. 22, 2019.)

performance. Mr. Washington did not appear to be putting forth his best true effort throughout the evaluation and appeared to be attempting to present himself in an overly negative manner. As such, extreme caution should be used in relying on the data of this evaluation as a reliable and valid estimate of Mr. Washington's true ability and achievement.

(Tr. 1688.) Cheah explained that the plaintiff's psychological assessments placed him in the low to extremely low range in cognitive ability, verbal comprehension, perceptual reasoning, ability to maintain attention, ability to maintain concentration, ability to exert mental control, and ability to process simple or routine visual material without making errors. (*Id.*) However, he warned that "extreme caution should be used in relying on the data of this evaluation as there is reason to doubt their validity." (*Id.*)

The ALJ appropriately gave significant weight to Cheah's psychological evaluation report. While Cheah warned that the results of the psychological tests he gave the plaintiff could not be relied upon to establish the plaintiff's actual functioning –in other words, the plaintiff's low and extremely low scores were not likely to reflect his actual ability, the ALJ could rely on Cheah's assessment of the plaintiff's performance – failing to focus on timed tasks, but working at an appropriate pace on untimed tasks, failing to put forth his best effort on the tests, presenting himself in the most negative light, etc. Likewise, with respect to the plaintiff's argument that the psychological tests administered by Cheah could not be used to determine malingering, to be sure, neither the tests themselves or the results of the tests could be used to establish malingering, however, Cheah could reasonably use the accumulated data obtained via his clinical evaluation and observation of the plaintiff's performance during testing to opine that the plaintiff was malingering. (Tr. 1689.) Nevertheless, Cheah also recognized, consistent with the plaintiff's treating VA physicians, that the plaintiff suffered from alcohol use disorder and posttraumatic stress disorder. (*Id.*)

Moreover, Cheah's malingering assessment was not inconsistent with concerns raised throughout the plaintiff's medical record that the plaintiff was not putting forth his true best effort and that as Dr. Victor, the plaintiff's treating psychiatrist who did not offer an opinion in this case, noted that, the plaintiff's performance on testing was "of some concern." (Tr. 1490 (noting, after the September 24, 2015 administration of the Brief Neuropsychological Examination ("BCNE"), that the plaintiff's performance was "of some concern" because "rarely do individuals perform better on the Part II subtests than they do on the Part I subtests . . . [because] the skills measured in Part II tend to decline before those in Part I in almost all neurological disease processes" and noting that the test will likely be re-administered"); Tr. 1472 (October 14, 2015 treatment note from Dr. Victor explaining that he had a, "[b]rief discussion" with the plaintiff's primary care provider who "questions many of the complaints that [the plaintiff] presents with."); Tr. 1466 (October 20, 2015 note from John Gottschalk, M.D. with whom the plaintiff followed up for depression, diagnosing the plaintiff with "[a]djustment disorder, unspecified" and noting that the plaintiff endorsed symptoms consistent with depression/adjustment disorder, but could not clarify the length of symptoms and some of them were questionable-especially his drinking history. The plaintiff "endorsed significant drinking at this time, then back tracked to less drinking that was caused by his wife[']s urging." Liver function, especially in a setting of antifungal use, does not support significant drinking history. "I do not doubt that [the plaintiff] has some issues that are probably related to his pending transition from Army life: however, [the severity of his symptoms] was hard to gauge"); Tr. 1451-52 October 28, 2015, appointment with Dr. Victor, discussing the plaintiff's performance on the Test of Memory Malingering ("TOMM") which "was generally very poor, to the point that I wondered how he was able to function in any capacity explaining that his performance was worse than I would expect from someone who had a diagnosis of Alzheimer's

Disease." Also noting that the plaintiff scored 18 on Trial 2 and 18 on the Retention trial which, according to "[r]esearch with the instrument suggests that . . . [the plaintiff] is not putting forth maximum effort in the evaluation process").)

Substantial evidence supported the ALJ's determination that Cheah's opinion was due significant weight because Cheah's assessment established that the plaintiff's testing data and subjective complaints were not reliable indicators of his functioning and ability, but, nevertheless, that the plaintiff exhibited signs of malingering, alcohol use disorder and posttraumatic stress disorder. *See Collier v. Berryhill*, No. 3:14-CV-01450, 2017 WL 2362481, at *6 (M.D. Tenn. May 31, 2017) (finding that the ALJ properly considered findings of consultative psychological examiner, Dr. Lambert, although Dr. Lambert could not fully assess the plaintiff's functioning or ability to work due to the plaintiff's malingering.) Cheah's findings were entirely consistent with the plaintiff's VA medical record evidence. The ALJ did not err in his consideration of Cheah's evaluation.

### 3. Tina Tomlinson, LCSW

The plaintiff's third claim of error is that the ALJ failed to properly consider the opinion of Tomlinson, a licensed clinical social worker.

On October 5, 2017, Tomlinson prepared a social security form entitled, "Medical statement concerning depression with anxiety, OSC, PTSD or panic disorder" (the "medical statement"), which was submitted to the ALJ after the cut-off for submitting new medical evidence. (Tr. 1856-59.) About five months earlier, on June 15, 2017, Tomlinson wrote a letter to the plaintiff "at [his] request" stating that he is receiving "mental healthcare and primary care to reduce symptoms associated with Post Traumatic Stress Disorder and Major Depressive order" at the Hopkinsville VA Clinic ("the clinic"). (Tr. 1798.) Tomlinson's letter explains that the plaintiff

"began mental health treatment at the clinic on" March 22, 2017 and that he is "engaged in outpatient therapy with [Tomlinson] on a monthly basis." (*Id.*) The letter does not indicate when the plaintiff began therapy with Tomlinson.

The plaintiff's VA medical records show that the plaintiff was seen by Lynda Formosa a Certified Registered Nurse Practitioner (CRNP) at the clinic on March 22, 2017. (Tr. 1839.) At this visit, Formosa noted that "[h]e is seeing mental health twice a week" and that "[n]o further interventions" were needed "at this time." (Tr. 1841.) Formosa diagnosed the plaintiff with chronic PTSD and recurrent, moderate "major depressive disorder." (Tr. 1803.) He next saw Formosa on April 25, 2017, at which time he stated that, "he was not currently engaged in therapy," but "expressed an interest in beginning." (Tr. 1834.) The plaintiff's diagnosis did not change, but Formosa noted that his "[p]resenting problems(s) are moderate to high severity." (Tr. 1803.) On May 9, 2017, less than one month after seeing Formosa, the plaintiff saw Tomlinson, for what appears to be his first visit with her. (*Id.*; *see also* Tr. 1790.) At this visit Tomlinson diagnosed the plaintiff with chronic PTSD, "Major Depressive Disorder, Recurrent, Severe without Psychotic Features," and "Problems in Relationship with Spouse or Partner" based on the plaintiff's subjective complaints during the visit. (*Id.*) On June 9, 2017, he saw Formosa, whose diagnosis remained unchanged from the plaintiff's April visit. (Tr. 1802, 1826-29.) He saw Tomlinson on June 15, 2017, the same date on which she wrote the letter to the plaintiff regarding his mental health treatment at the clinic. (Tr. 1802.) Tomlinson's diagnosis remained the same. (*Id.*) The plaintiff may have seen Formosa and Tomlinson in July 2017, although the VA appointment notes are not clear on this point. (Tr. 1802.) The plaintiff saw Formosa again on September 12, 2017 at which time she diagnosed the plaintiff with chronic PTSD, recurrent, moderate major depressive disorder and insomnia due to other mental disorder. (*Id.*)

On October 5, 2017, Tomlinson prepared the "medical statement." (Tr. 1856-59.) It is unclear if she met with the plaintiff on that day or if she was just given the form to complete. Notably, the form is a check-the-box type form with space for comments, although Tomlinson included none. (*Id.*) Nor did she cite to any substantiating evidence of any kind, whether a psychological assessment or therapy notes. (*Id.*)

As a licensed clinical social worker, Tomlinson is an "other source." The ALJ has the discretion to determine what weight to accord "other source" opinions. *See, e.g., Cruse v. Comm'r of Soc. Sec*., 502 F.3d 532, 541 (6th Cir. 2007); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530 (6th Cir. 1997). Unless a treating sources medical opinion is given controlling weight, the same factors used to evaluate acceptable medical sources under 20 C.F.R. § 404.1527 also apply in evaluating opinions from "other medical sources." *Id.* Those factors include: (1) "[h]ow long the source has known and how frequently the source has seen the individual"; (2) "[h]ow consistent the opinion is with other evidence"; (3) "[t]he degree to which the source presents relevant evidence to support an opinion;" (4) "[h]ow well the source explains the opinion"; (5) "[w]hether the source has a specialty or area of expertise related to the individual's impairment(s)"; and (6) "[a]ny other factors that tend to support or refute the opinion." *Racz v. Comm'r of Soc. Sec.*, No. 3:15-CV-74, 2016 WL 612536, at *10 (S.D. Ohio Feb. 16, 2016) (quoting SSR 06-03p, 2006 WL 2329939, at *5.)

Although "[a]n ALJ must consider other-source opinions and generally should explain the weight given to opinions for these 'other sources . . . other-source opinions are not entitled to any special deference." *Hill v. Comm'r of Soc. Sec*., 560 F. App'x 547, 549 (6th Cir. 2014) (internal quotation marks and citations omitted). Furthermore, because "other medical sources" are not considered "treating sources," their opinions are not subject to the "reason-giving" requirement of

the treating physician rule. *See, e.g., Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007); *Borden v. Comm'r of Soc. Sec.*, 2014 WL 7335176, at *9 (N.D. Ohio Dec. 19, 2014).

The ALJ determined that Tomlinson's opinion was worth no weight because her assessments that the plaintiff was markedly or extremely limited were predicated on the plaintiff's subjective complaints, Tomlinson did not administer any diagnostic testing, and based on internal inconsistencies in the opinion. Substantial evidence in the record supports the ALJ's decision to reject Tomlinson's opinion. There is no evidence about Tomlinson's expertise in treating PTSD or depression, Tomlinson appears to have seen the plaintiff only a few times before preparing the "medical statement," she does not cite to any evidence in the medical record to support her opinion, nor does she cite to specific observations or testing that would support her opinion.[8] *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011) (noting that "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.")Substantial evidence supported the ALJ's finding that Tomlinson's opinion was worth no weight. The ALJ did not err in his assessment of Tomlinson's opinion.

### 4. Record Review

The plaintiff's final claim of error is that the ALJ did not properly consider all of the medical evidence of record because "[t]he underlying record is consistent with, and supports the opinions which undermine the ALJ's mental RFC finding." (Doc. No. 15, PageID# 1923.)

Under the Regulations, an ALJ must consider all of the evidence in a plaintiff's record. *See* 20 C.F.R. § 404.1520(a)(3) (stating "[w]e will consider all evidence in your case record when we

---

[8] Futhermore, there is no evidence in the record to suggest why Tomlinson's diagnosis was inconsistent with Formosa's more moderate diagnosis.

make a determination or decision whether you are disabled."). However, ALJs are not required to discuss each piece of evidence in their decision, "so long as they consider the evidence as a whole and reach a reasoned conclusion." *Boseley v. Comm'r of Soc. Sec.*, 397 F. App'x. 195, 199 (6th Cir. 2010) (citing *Kornecky*, 167 F. App'x. at 507-08). The ALJ expressly stated that he considered opinion evidence in accordance with SSA Regulation and Rules, (Tr. 26), and, although not identified in the decision, the ALJ attached as an exhibit all of the evidence of record that he considered in making his decision, including the untimely submitted "medical statement" prepared by Tomlinson (Tr. 35-41.) The ALJ sufficiently discharged his duty to consider the evidence of record.

Moreover, as described in detail above, the evidence of record was not consistent a more restrictive mental RFC with nor did it undermine the ALJ's mental RFC finding because the plaintiff's medical record is replete with notes from treating sources, both physicians and psychologists, questioning the plaintiff's effort on a number of diagnostic tests, suggesting that the plaintiff went out of his way to make himself appear in the most negative light possible, and questioning the veracity and accuracy of the plaintiff's description of the intensity of his symptoms. *See* Part C.2 above; *see also* (Tr. 1682-89 (Cheah's assessment and reasoning for diagnosing malingering); Tr. 1490 (Victor expressing concern regarding the plaintiff's performance on normed testing due to the significant irregularity in the plaintiff's scoring and suggesting that the test would have to be re-administered); Tr. 1472 (Victor explaining that the plaintiff's primary care provider questioned the plaintiff's complaints); Tr. 1466 (Gottschalk, the plaintiff's treating physician's finding "questionable" the extent of and severity of the symptoms the plaintiff endorsed and his claimed history of heavy drinking); Tr. 1451-52 (Victor, questioning

the plaintiff's effort and performance on normed memory testing the scores of which showed that the plaintiff tested worse than someone diagnosed with Alzheimer's disease.)

Substantial evidence supported the ALJ's decision and he did not err in his consideration of the record and opinion evidence as a whole.

### V.  Conclusion and Recommendation

For the reasons explained above, the Magistrate Judge **RECOMMENDS** that Plaintiff's motion for judgment on the administrative record (ECF No. 15) be **DENIED**, and the SSA's decision be **AFFIRMED**.  The parties have fourteen (14) days after being served with a copy of this Report and Recommendation to serve and file written objections to the findings and recommendation proposed herein.  A party shall respond to the objecting party's objections to this Report and Recommendation within fourteen (14) days after being served with a copy thereof.  Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation may constitute a waiver of further appeal.  *Thomas v. Arn*, 474 U.S. 140, 142, *reh'g denied*, 474 U.S. 111 (1986); *see Alspaugh v. McConnell*, 643 F.3d 162, 166 (6th Cir. 2011).

**ENTERED** this 4th day of February, 2019

_____
JOE B. BROWN
United States Magistrate Judge